25-9531, Ute Indian Tribe v. EPA. Mr. Holditch, you may proceed. May it please the Court. Good morning, Your Honors. My name is Michael Holditch. I am appearing on behalf of the appellant, the Ute Indian Tribe. I'm joined by my co-counsel and colleague, Mr. Jeffrey Rasmussen. Your Honor, this case revolves around a 500-megawatt coal-fired power plant electric generation unit, the only one of its kind, located not near, not around, but on the reservation homeland of the appellant, the Ute Indian Tribe. The Bonanza power plant emits nitrogen oxide, sulfur dioxide, particulate matters, and other known pollutants directly into tribal airspace. For around 15 years, from around 2000 to 2015, it emitted these pollutants into tribal airspace without the controls, conditions, or limitations of a Title V operating permit as required by the United States Clean Air Act. The air quality impacts that resulted from these unbridled emissions have never been meaningfully addressed, mitigated, or studied. The United States Environmental Protection Agency stood by for a decade and a half and allowed these unbridled emissions, only to subsequently issue and now renew a Title V operating permit as if nothing had ever happened. So at its core, this is not a case about forcing an operator to comply with air quality standards, nor is this a case to antagonize producers engaged in fossil fuel production on the Utenoi Reservation. What this is a case is about EPA and its failure to uphold its unique government-to-government relationship with the Ute Indian Tribe, which is defined not only by the exacting fiduciary standards of a trustee, but also by their mutual relationship as sovereigns with concurrent jurisdiction over the lands and airspace. If you wanted to challenge the efficacy of the pollution control measures that EPA approved, is there another form or another way to do that? You're not really making a direct attack on whether they're adequately protecting the health and safety of the people that live near it. You're attacking basically the process that was used. Is there a substantive case that you have somewhere where you challenge that? There's no substantive case right now challenging directly the adequacy of the control measures. What we're challenging here, your honor, is the assurances that have been provided to the tribe, whether that's through studies or data provided, that these control measures actually do what they're supposed to do. Let me stop you for a minute. I don't think that was responsive. I think what the judge was asking you was if there was another forum where you could get relief, another avenue, like challenging the permit or something like that. There is, yes. You could challenge the permit itself for the adequacy of the control measures, whether that's through a violation of the permit itself, through a citizen supervision under the Clean Air Act, or through a separate APA action that's slightly different in nature and character from the current one, in which there would be a direct challenge to the sufficiency of the controls, where we say this control is not sufficient, and here's why. But this case is more focused on the EPA and its abject failure to uphold its requirements vis-a-vis its government-to-government relationship with the tribe. So here EPA's approval of the Title V permit renewal can be broken down into two salient shortcomings. First, EPA failed to engage in meaningful government-to-government consultation in compliance with its own tribal consultation policy. And second, EPA failed to consider all relevant factors when issuing its approval, including factors pertinent to the best interest of the tribe pursuant to its trust, responsibility, and relationship, rendering EPA's decision arbitrary and capricious under the APA standard. Well, the record does disclose there was some consultation. Where do you think the, you know, there's kind of a line drawing exercise that we have here with, you know, how much is enough under the EPA's policy guidance. What was the specific failure here? So the specific, there's a few specific failures here. One is simply that we have a 92-page Title V permit and there was, you know, a grand total aggregate of less than two hours of government-to-government consultation. Now we're not as, you know, I think the briefing makes clear, we're not trying to draw a bright line of, you know, does this issue require two hours versus this level of complexity requires three hours, four hours, et cetera. It's not a time-based test, it's a functionality test. So we know that the consultation was deficient and cursory because the legitimate questions and concerns that were raised by the tribe during this consultation process were never meaningfully addressed. And those include things like how does this SCR, Selective Catalytic Reduction Technology, and I'm talking from a lay perspective now, that's the technology that once installed is supposed to function to lift the lifetime cap or the cap on coal combustion at the facility and allow coal consumption indefinitely. What studies and what scope of that technology provides the assurances necessary that indefinite coal consumption at this location on the tribe's reservation will not result in localized adverse air quality impacts, things like that. And that's kind of a forward-looking example. As a backward-looking example, the tribe had requested, you know, consideration of what controls could be put in place or measures could be put in place to offset the 15-plus years of unbridled emissions that took place on the tribe's reservation as a result of EPA's failure to establish those control measures before it was required to. The substantive aspects of the consultation, don't our cases generally say that a policy guidance document is not legally binding on the agency? And, you know, we have a couple cases in the briefs that stand for that proposition. Why is this policy guidance legally binding as opposed to the general rule that they are not? So that's a fantastic question, your honor, and I think the title of this agency document as a policy can be misleading, but really the distinction here is between a general policy statement and a that impacts the public. So under 10th Circuit case law, the agency is required to follow its own procedures, especially when those procedures directly impact the public or individual rights. Here we're talking about the rights of the sovereign Ute Indian tribe to provide, you know, meaningful input and have that input considered in a real way. So I think a key What's the case that is the best support for that proposition? I think the best case would be actually the U.S. Supreme Court case in Morton versus Ruiz, because that sets a good illustrative point of distinction between the primary case that the EPA has cited, which is the AMREP Corp case. In the Morton versus Ruiz case, the Supreme Court found that there was an agency procedure in place, and this deals with Indian tribal issues as well, where any departure from or determination relating to the eligibility requirement of enrolled tribal members for general assistance program funding required, you know, certain procedures, publication, things like that. Their departure from that standard without any rational explanation rendered the agency action arbitrary. Wasn't the policy there after notice and comment, traditional rulemaking? I don't believe in Morton versus Ruiz it was. I believe this was their policy and practice of publishing, excuse me, any departure or deviation or protocol regarding eligibility requirements. I don't believe that went through a notice, a notice of rulemaking process. Now, that would be, Your Honor, the process for something like a general policy statement to suddenly become binding upon the agency. So we have a general policy statement, which under the case law supplied by the EPA is more like an informal pronouncement for the legal standard that the agency will use when applying its enforcement or adjudicatory authority. For example, in the AMREP Corp case that they cited, at length in their briefing, the general policy statement was just an informal letter from the Federal Trade Commission to a member of Congress, one of the committee chairmen, about, you know, a general outline of the standards they would follow for deceptive trade practices. So, of course, something that would have the force of law like that couldn't be done through such an informal process. But here, so that's why a general policy statement does require that rulemaking process. Now, here we're talking about something that's not a general policy. Let me ask you something real, real fast, just in a sort of, you'll work into this probably, but at the base of this is the Executive Order 13-175. Correct. And you're not making a direct challenge on that. Correct. But that's the document that results in the creation of this policy. Correct. Okay. And the Executive Order expressly disavows that it's rights that are judicially enforceable in any one. You agree with that? I do. Okay. So my question is, can the policy, without any rulemaking notice and comment, expand on the base document? Can it create rights that the base document expressly disavows? I think it can because it would not be, what the Executive Order functions to do is it creates a directive for agencies to create their own procedures and protocols for tribal consultation. So by disavowing any right to relief under the Executive Order itself, what it's doing is disavowing a citizen or whoever's, an aggrieved party's right to challenge an agency's failure to establish a procedure for tribal consultation pursuant to the directive of the Executive Order. Once an agency has done that and established procedures that directly impact, in this case, tribal governments and their membership, then, you know, they are held to the Morton v. Ruiz standard as well as the 10th Circuit's Bighorn Coal Company standard, which says that agencies do have to follow their own procedures and protocols or provide at least, at the very least, an explanation for their departure. To follow up on that, the, you know, Executive Order is merely a pronouncement by the President in most cases that this is the way, you know, my agencies, i.e. the EPA, are going to operate, you know. Generally, if the agency doesn't follow an Executive Order, that's, you know, that's a two-issue. Most of the cases, as I understand, require a statutory basis to ensure that there's a, you know, a judicial review process, right? What's the statutory basis that we can hang our hat on that would allow us to give judicial review of this particular policy document? Well, there's no statutory basis for the Executive Order, nor is there a statutory basis for the consultation policy. It's a normative standard that's been set by the courts for a policy, or excuse me, not a policy, but a procedure of this nature. And, of course, there's also the APA would be the statutory hook in that sense, in that the precedent provides that a failure to comply or uphold procedures that impact the statutory and capricious. Your Honor, I'd like to reserve the remainder of my time. Thank you. Let's hear from Mr. Higgins. Good morning. May it please the Court. I am Elliot Higgins from the Department of Justice, representing EPA. With me at Council's table is Makram Jaber. He is the Council for Respondent, Intervenor, Deseret Generation and Transmission Cooperative. Your Honors, I will seek to make three points today. First, EPA was under no enforceable duty to consult the Ute Tribe here. Second, even if there were such a duty, EPA discharged it by meaningfully consulting the tribe. And third, EPA acted consistently with its trust responsibility. I will start with the lack of any enforceable duty to consult the tribe. The only two potential sources of that duty are Executive Order 13175 and EPA's related tribal consultation policy. The Executive Order is not enforceable for the reasons explained in EPA's brief at pages 14 through 15. That is, the order is not based on any statute, the order itself expressly precludes judicial review, and the order supplies no law to apply. Perhaps in recognition of these... Could we hang our hat on the EPA, you know, arbitrary, capricious review or failure to follow the law as a jurisdictional hook here? Well, as an initial matter, Your Honor, I would say that the agency did follow the policy. You know, the agency... There are four phases set forth in the policy, identification of the agency action, notification of the tribe, solicitation of comments, and then response to those comments. EPA followed all of those steps. So I think there is no argument that EPA, in fact, departed from the policy, and therefore under the EPA required to provide some explanation for the departure, because there was no departure. So, but you're right, Your Honor. I mean, EPA does hang its hat on the tribal consultation policy, and like the executive order, the policy is unenforceable. The AMRAP case, which my friend mentioned earlier, holds that there are only two methods by which an agency may formulate binding policy, through rulemaking procedures or through adjudications that create binding precedents. The EPA's tribal consultation policy was not promulgated under either of these mechanisms. In its reply, the tribe attempts to get around that straightforward conclusion by insisting that the tribal consultation policy is not, in fact, a policy at all, but a procedural rule enforceable under Morton v. Ruiz. As an initial matter, Your Honor, we would proffer that petitioners... Petitioner waive this argument by making it for the first time on reply, and in any event, the argument fails on the merits. The legal treatise Wright and Miller, sections 8202 and 8203, provide guidance on the distinction between policy statements and procedural rules. Generally speaking, a policy statement advises the public about how the agency intends to exercise a discretionary powder prospectively in the future. A procedural rule, on the other hand, is a rule that dictates the manner in which parties present themselves or their viewpoints to the agencies. Here, considering these two definitions, the tribal consultation policy is just that, a policy, a policy statement. Would you do me a favor? Sure. What were the sections on your Wright and Miller cite? Sections 8202 and 8203. Okay. And those sections surveyed the case law describing what is a general statement of policy as well as what is a procedural rule under the APA. As far as I know, those terms aren't defined by statute, but they've been interpreted through the years through case law. And again, a policy statement, according to Wright and Miller, advises the public about how an agency intends to prospectively exercise a discretionary authority while a procedural rule dictates the terms by which parties present themselves or their viewpoints to the agency. So can the agency arbitrarily depart from its policy statements? Well, I think you need to look at whether the policy statement is binding or not. If a statement is binding, I think certainly an agency would need to explain why it is departing from that policy. What's your distinction between a binding and a non-binding? Well, a binding policy has been promulgated via notice and comment or via an adjudication that sets precedent for the agency, whereas a non-binding policy is not promulgated under either of those mechanisms. And the agency can depart from a non-binding policy arbitrarily, on a whim, capriciously. I think that's an open question, Your Honor. I think it would be certainly best practice if an agency departed from a non-binding policy. Well, if it's an open question, then maybe we have, we do have judicial review here. Well, in that case, Your Honor, we would take the position that there's no departure from the policy here. You know, EPA followed it to the letter of the policy. I won't say the letter of the law because it's not binding, but followed it to the letter of the policy. The policy identifies four stages. You must identify actions that implicate tribal interests. You must notify the tribe about those actions, solicit the tribe's comments, and then respond to the tribe's comments. EPA did all of those things here. And, you know, if you look at it more granularly, EPA held four meetings. There was a notification, a pre-consultation meeting, an information meeting, and then two technical consultation meetings. So while my friend earlier said that there were only two hours worth of consultation, I think actually if you look at it in the broader context, including those, the pre-consultation meeting and the informational meeting, we had many hours of opportunities for the tribe to provide input on this action. What are the different forms that consultation may take? Well, EPA seeks to facilitate consultation typically via in-person meetings or, you know, via Zoom or Skype. In this particular case, and I think there is some variance because, again, it's a non-binding policy, but in this particular case there were four meetings. A pre-consultation meeting in which the agency notifies the tribe about this impending action, an informational meeting in which it describes the imminent proposed action, and then two consultation meetings where the tribe actually has an opportunity to provide feedback once they've had an opportunity to review the draft, in this case the draft Title V permit. But there were also opportunities for, you know, the exchange of written documents. So in this case, pursuant to notice and comment, the tribe submitted written comments on the draft permit. The agency created a response to comments document, and here, even though it was under no obligation to do so, provided a draft copy of that response to comments document to the tribe so the tribe could provide further written feedback. And all of this, you know, the end goal of all of this was to facilitate meaningful consultation between the tribe and the agency here. What do you do with the argument that a large part of the EPA's consultation didn't occur with the right people within the tribe? Well, your honor, neither the executive order nor the tribal consultation policy dictate who on the part of the tribal government, who on the part of the tribe must be present for those consultation meetings. No, I get that. But I mean, at some point, if your point is that you can talk to whoever you want, at some point that becomes, could be a sham. You could go seek out somebody who didn't really care, who had no authority, those type of things, and have consultation with them, and you would effectively be circumventing the policy behind the whole thing. Yes, your honor. Well, two points in response to that. The executive order does require, or at least advise, the agency to consult with tribal officials. Here we did that. The agency consulted with tribal officials throughout the four meetings. Petitioner's main complaint, as far as I understand it, is in one of the two explicit consultation meetings, the full tribal government was not in attendance. But the executive, neither the executive order nor the policy say that consultation may only occur if the full tribal government is attendance. Or, you know, likewise, that the policy does not insist that EPA must consult in the manner in which the tribe would most prefer. Now, to be sure, the agency does endeavor to consult in accordance with the tribe's preference. But I think the more salient point is it's under no obligation to do so. And certainly here on these facts, you know, it was no sham. EPA sought to consult with the right people, and on at least one occasion, the petitioner concedes that EPA did consult with the full tribal government, which is their preference. Finally, your honors, I'd like to move to my third point, which is that EPA acted consistently with its federal trust relationship. To prevail on a breach of trust claim, a tribe must establish that the text of a treaty, statute, or regulation impose certain duties on the United States. Here, the tribe fails to identify any statutory, regulatory, or treaty-based duty requiring EPA to act in a trustee capacity with respect to issuing Title V permits. Counsel, can I stop you there? So let me just ask you, are you taking the position that you could make all decisions with regard to this plant without speaking to the tribe? I know you say you wouldn't do that, but does your position suggest that you have no obligation, either under the trust responsibility or any other source, to speak to the tribe at all? Well, your honor, I think we have two distinct issues here. So one is the conventional fiduciary duty, trust-creating duty, under which a tribe may bring a breach of trust claim. That is not this case, because the... Right, but I mean, you're saying you don't have an obligation under the trust responsibility. Well, your honor... They could try to bring a claim, but it would lose, correct? That is correct, your honor. Although I would say that the agency does feel strongly about adhering to its more general trust responsibility to tribes. So, you know, it's our position that we discharge that responsibility by complying with the Clean Air Act, by considering the tribe's interests to the extent we have discretion to do so. So I would be reluctant to say the EPA has absolutely no obligation whatsoever. Well, tell me what the obligation would be. I understand you don't want to say that, and that's why I'm pushing you on it. But I'm trying to figure out, is there any obligation under anything to speak to the tribe before you make decisions with regard to the plant? Your honor, yes. Under the general trust responsibility, EPA respects that relationship, and EPA does endeavor to consult with the tribe to the extent... I know, but that's not what I ask. I'm sorry. But I just have to push you. There is no legal obligation. You want to do what's right. That's what you're telling me. You endeavor to do what's right, but there's no legal obligation to speak to the tribe at all under your position. Just tell me, just tell me, is there anywhere? I would be reluctant to go that far, your honor. But I think the more salient point from our perspective is that a tribe could not bring a claim solely under the general trust obligation. That general trust obligation exists. EPA endeavors to treat the tribes with respect as sovereigns, but the tribe cannot, you know, under recent Supreme Court case law, the Hickory case, the Navajo Nation case, EPA cannot bring a standalone claim under that general trust obligation. Well, yeah, and just to follow up on that, assume that the executive order was rescinded, so there's no policy document here. I thought, I wondered why you were reluctant to say you had no duty if it's not binding, but let's say it's repealed. Does the general trust obligation provide, would that be the only avenue for the tribe to claim a right to some type of consultation? Yes, your, well, your honor, I think that would be the only basis for such a claim. Although, again, our position... You said there's, but there's no basis for a claim here because there was consultation or because... Because a tribe, because the general trust obligation does not provide jurisdiction to the courts or otherwise enable tribes to bring standalone claims under that. They have to identify a treaty that's been violated, a treaty that imposes a duty on the United States, a statute, a regulation that imposes a duty. The Clean Air Act claim would be... Right. So here, our position is the Clean Air Act imposes no such duty. Had it imposed such a duty, they could bring such a claim, but it does not. So inclusion, your honors, if there are no further questions, I'll see the rest of my time and sum up by saying the petition... Just before you sit down, and if we're talking about a state instead of a tribe, would all of your answers be the same? Say the state of Utah. If the state took the position that we had not consulted with the state... Your honor, we didn't brief that question. And, well, certainly the, all of the trust case law that we have been discussing would not be relevant. It may be the case that under the Constitution, you know, the 10th Amendment or something to that effect, there would be, but I'm reluctant to speculate having not actually particularly, you know, researched that question. All right. Thank you. I see that my time is up. Thank you very much. Have some rebuttal time. Thank you very much, your honor. I would like to rebuttal time to discuss the trust responsibility and the EPA's trust relationship with the Ute Indian tribe. Now, what the EPA is trying to push here is essentially what we call the Mitchell 2 standard, which is the standard for establishing a specific enforceable fiduciary duty, normally in money damages that you can enforce for failing to uphold that specific duty for, you know, in the Mitchell 2 standard, you know, that was the management of tribal timber for the economic benefit of the tribe. I want to make a very important clarification that the trust relationship does not begin and end with the Mitchell 2 standard for specific enforceable trust duties. The trust relationship exists notwithstanding that, and that's important here for two distinct reasons. One, as EPA indicated, there is a tie between the general trust responsibility and the agency's obligation to engage in some level of consultation with the tribal government. Now, part of that trust relationship is upholding tribal sovereignty, and the very constitution and bylaws of the Ute Indian tribe provide that the tribal business committee is the governing body of the tribe that interfaces with federal agencies. So the EPA does not, it's inconsistent with this trust relationship for the EPA to pick and choose who it consults with, whether that's low-level officials or the business committee. Second, I want to clarify that even the standard for the relevant factors test, which is we all parties have agreed that an agency action is arbitrary and capricious if not all relevant factors were considered. Under Cheyenne-Arapaho and under Woods Petroleum, the trust relationship and the consideration of the best interest of the tribe is inseverable from this relevant factors analysis, regardless of whether we've identified a specific fiduciary duty by statute under the Mitchell II standard. Thank you. Thank you, counsel. Appreciate the arguments. Those are helpful. Case is submitted and you're excused.